**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FRANK M. SULLIVAN, III, | |
| Plaintiff, | |
| v. | Case No. 06 C 5240 |
| JIMMY JAMISON | Judge Sharon Johnson Coleman |
| | Magistrate Judge Michael Mason |
| Defendant | |
| JIMMY JAMISON and MICHAEL STEPHAN ELLIS, | |
| Counterclaimants, | |
| v. | |
| FRANK M. SULLIVAN, III (d/b/a Survivor) and SURVIVOR MUSIC, INC., | |
| Counter-defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Frank M. Sullivan ("Sullivan"), and Survivor Music, Inc. ("SMI") move to dismiss the counterclaim brought against them by Jimmy Jamison ("Jamison") and Michael Stephan Ellis ("Ellis"). The counterclaim alleges seven claims against Sullivan and SMI for breach of contract, breach of fiduciary duty, fraud, fraudulent concealment, quantum meruit, unjust enrichment, and an accounting based on Sullivan and SMI's failure to pay royalties. Sullivan and SMI contend that Jamison and Ellis are not entitled to relief because without a

contract the claims fail and, even if there were a contract for payment of royalties, the claims are barred by the applicable statute of limitations. For the reasons that follow, the motion is denied.

**Background**

The following factual background derives from the counterclaim and attached exhibits. On November 7, 1978, Sullivan, Dave Bickler ("Bickler"), Jim Peterik ("Peterik"), Robert Gary Smith ("Smith"), and Dennis Keith Johnson ("Johnson") formed a joint venture to create the band Survivor. (Counterclaim, Exhibit 1). The joint venture agreement provided that all five original members of Survivor would share equally in the profits generated by the band. The joint venture agreement also provided for compensating members after they leave the joint venture. On that same date, Survivor entered into a recording contract with Scotti Brothers Records, Inc. ("Scotti Brothers"), that provided for royalties to be paid to the band. (Counterclaim ¶9, Exhibit 2). The Scotti Brothers' recording contract also provided for the removal and replacement of members. In 1983, Survivor entered an amended recording contract with Scotti Brothers. (Counterclaim ¶20, Exhibit 3).

Jamison and Ellis allege that they were members of Survivor entitled to royalties under the 1978 and 1983 recording contracts with Scotti Brothers since they each signed inducement letters as replacement members, agreeing to be bound by the terms of the contracts. (Counterclaim ¶¶ 22, 25). Jamison and Ellis also allege that Sullivan and the other members of Survivor induced them to join the band by telling them that they would enjoy all the benefits of the joint venture agreement and share equally in any profits and royalties. Ellis left Survivor around 1987, and Jamison stopped performing with Peterik and Sullivan in 1988.

Sometime in 1996, Sullivan's accountant and Survivor band manager, Charles DiGiovanni ("DiGiovanni") began reviewing Survivor's royalty statements. DiGiovanni

discovered that Scotti Brothers and their successor-in-interest All American Communications, Inc. ("All American"), had not been issuing royalty statements to Survivor since the early 1990's. On February 8, 1997, DiGiovanni wrote a letter on behalf of Survivor to Michael Botros of All American, demanding payment of the royalties due the band. (Counterclaim ¶36, Exhibit 8). In the letter, DiGiovanni specifically stated that, with certain exceptions for Peterik (who was also a producer), that the royalties should be paid to the band as a whole because "[t]his allows us to square away any internal discrepancies in payments among *all the band members*." (Counterclaim ¶36, Exhibit 8) In April 1998, Sullivan and SMI filed suit against All American claiming $1.5 million in damages. (Counterclaim ¶39, Exhibit 9). The litigation ended in a settlement agreement. Sometime in 1999, Peterik learned of the litigation and demanded his share, and also that proceeds be distributed evenly between the members and former members of the band who performed on each of the recordings. The terms of the settlement agreement provided that Sullivan, SMI and Survivor release claims against All American through December 31, 1998. Jamison and Ellis allege that, since that date, Sullivan and SMI has received at least 80% of the royalties directly from All American and subsequent owners of Survivor's master recordings.

From 1996 to 1999, Ellis toured with Survivor, though no new albums were recorded. Ellis frequently asked Sullivan about royalties, including proceeds from "Eye of the Tiger," the band's most successful single on which Ellis performed. Sullivan allegedly told Ellis that Survivor would never receive any money due to the unfavorable terms of the 1978 and 1983 recording contracts with Scotti Brothers. During this same time frame, Sullivan was pursuing the litigation against All American and claiming $1.5 million in damages from unpaid profits and royalties .

In March 2000, Sullivan and Jamison reached an agreement for Jamison to rejoin the band and created a new entity, "Unified Music," an Illinois corporation. Under the new agreement, Jamison became a 50% partner in Survivor and believed that royalties on all of the band's recordings would be paid to Unified Music. Sullivan, DiGiovanni, and SMI allegedly acknowledged that Jamison was entitled to royalties based on his previous tenure with the band, but represented to him that Survivor still had a negative balance with the record label and it was unlikely that it would ever receive any royalties. Jamison claims he was never informed of the litigation and settlement reached with All American. Jamison also claims he was never informed that SMI, not Unified Music, was operating as the legal entity of Survivor and was receiving 80% of the royalty payments.

Around mid-2009, Jamison discovered from Peterik that Peterik had been receiving a 20% share of royalties, while Sullivan was receiving the remaining 80% directly from Sony (which now owns most of Survivor's master recordings) and paid to SMI. Jamison informed Ellis that Peterik had been receiving royalties and the instant counterclaim was filed.

**Legal Standard**

In order to withstand a motion to dismiss, a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The allegations must be sufficient to give the defendant fair notice of the claim and its basis. Windy City Metal Fabricators & Supply, Inc. v. CIT Tech Fin. Servs., 536 F.3d 663, 667 (7th Cir. 2008). "In order to demonstrate that he is entitled to relief, however, the pleader must show through his allegations that it is plausible, rather than merely speculative, that he is entitled to relief." INEOS Polymers, Inc. v. BASF Catalysts, 553 F. 3d 491, 497 (7th Cir. 2009). When deciding to dismiss a complaint, the Court accepts all well-pleaded allegations as true (Bell

Atlantic Corp. v. Twombly, 550 U.S. 544, 559 (2007)), and draws all reasonable inferences in favor of the pleader. Pisciotta v. Old Nat. Bancorp, 499 F.3d 629, 633 (7th Cir. 2007).

## Discussion

*1. Failure to State a Claim*

Sullivan argues that the counterclaim fails to state a claim upon which relief can be granted because Jamison and Ellis are not parties to any written or oral contracts that would entitle them to royalty payments. Sullivan asserts that Jamison and Ellis have "cobbled together" from various contracts and letters a claim for royalties. A copy of any written instrument that is an exhibit to a complaint is considered to be a part of the pleadings. Fed. R. Civ. P. 10(c); Moranski v. Gen. Motors Corp., 433 F. 3d 537, 539 (7th Cir. 2005).

A review of the counterclaim and attached exhibits, shows that Jamison and Ellis, though not signatories to the original recording contract, have pled sufficiently to make a plausible claim for relief as replacement members under the relevant provisions of the 1978 and 1983 recording contracts. The 1978 recording contract with Scotti Brothers provided for replacement members, stating: "You shall cause any such individual so approved by us as a *replacement member* to be bound by *all of the terms and provisions of this contract*...". (Emphasis added) (Exhibit 2, ¶24(b)).

In 1983, Sullivan, Bickler, and Peterik, entered a "new agreement" with Scotti Brothers, amending the 1978 contract. (Counterclaim, Exhibit 3). Paragraph 6, referred to "Additional Members," stating: "Survivor agrees to cause all other persons performing musical services as part of or to Survivor, on other than a 'sideman' basis, including without limitation, Marc Doubray and Stephen Ellis, to execute the inducement letters attached hereto as Exhibit 'B' (with respect to Marc Doubray), Exhibit 'C' (with respect to Stephen Ellis), and Exhibit 'D'

(with respect to any such persons other than Marc Doubray or Stephen Ellis), and Survivor further agrees to deliver such executed inducement letters to Scotti Bros. promptly after the execution hereof. Such execution and delivery shall be deemed a material condition of this agreement." The inducement letters executed by Marc Doubray and Stephen Ellis are attached to the counterclaim and state that the signatories "agree to be bound by the terms and conditions thereof including, without limitation, the terms and conditions of the Present Contract [1978] and the terms and conditions of the New Agreement [1983]." (Counterclaim, Exhibit 4, 5). Jamison alleges he entered into the same inducement letter as Ellis and Marc Doubray. (Counterclaim ¶25) A letter, on Scotti Brothers' letterhead, evidencing Jamison's inducement letter states: "Enclosed please find a document to be executed *by the new member of Survivor, Jimi Jamison*. This document provides that Mr. Jamison assents to and agrees to be bound by the terms of the Survivor Agreements as amended. Please cause Jimi Jamison to execute the document, then have it returned to me." (Emphasis added) (Counterclaim, Exhibit 6). Accordingly, the 1978 and 1983 contracts incorporated new members of the band through the execution of inducement letters and bound them to the contracts to the same degree as the original members.

On October 23, 1986, Gerald Margolis, an attorney for Survivor, wrote a letter to Jamison's attorney concerning the relationship between the corporation Survivor Music Enterprises, Inc. and Jamison. (Counterclaim, Exhibit 7). The letter states in relevant part, "So far as I am able to ascertain from John Baruck [manager] and from the accountant for Survivor Music Enterprises, Inc., *Jimi Jamison has indeed and in fact been extended and enjoyed all the benefits of the other individual members* of the recording and performing group Survivor, commencing with the admission of him as a member of the group and through the present date.... *the group is comprised of five individuals (including your client)*, and business structures aside,

the *net revenues of the group* from personal appearances and phonorecords *are split among the members in equal shares*. This is pursuant to the understanding that Jimi Jamison would, from and after the event of joining the group, share equally *with the other fully vested members* the actual revenues derived from services as recording artists and musical performers." (Emphasis added) (Counterclaim, Exhibit 7). Although Sullivan claims this letter only refers to *negotiations* for Jamison to join the group, the content of the letter refutes that claim by repeatedly referring to Jamison in terms of being a present and ongoing member of Survivor. In fact, Mr. Margolis apologizes for "a failure on [his] part to formalize or document the understandings which in fact exist and which in fact your client has been living under and benefitting by, and I represent to you that it is neither from disrespect nor lack of care and concern from the interests of Jimi Jamison or the obligations of my own clients, but rather my own notion of priorities which has resulted in there not being appropriate documentation of the understandings which have existed and which are in fact being performed." (Counterclaim, Exhibit 7).

Sullivan's argument that there was no enforceable contract because the documents offered by Jamison and Ellis as evidence of a contract, do not indicate all of the essential terms is unavailing at this stage of the litigation. Jamison and Ellis have alleged sufficiently that they were bound, as replacement members, by all the terms and conditions of the 1978 and 1983 recording contracts with Scotti Brothers to the same extent as the other members of the band. The counterclaim and attached exhibits at least raise above the speculative level Jamison and Ellis' claim that they were members of Survivor entitled to royalties and that the failure to pay their share was a breach of those contracts.

Even under the heightened pleading requirements of Rule 9(b) for claims sounding in fraud, Jamison and Ellis' counterclaim alleges sufficient facts to withstand a motion to dismiss. The heightened pleading of Rule 9(b) requires " the who, what, when, where, and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7 th Cir. 1990). Jamison and Ellis allege that Sullivan fraudulently concealed their claim for royalty payments. Under the Illinois fraudulent concealment statute, 735 ILCS 5/13-215, specific acts or representations by a defendant must have been "calculated to lull or induce [a plaintiff] into delaying filing [its] claim or to prevent [it] from discovering [its] claim." Int'l Star Registry v. ABC Radio Network, Inc., 451 F.Supp.2d 982, 986 (N.D.Ill. 2006).

Here, the counterclaim alleges that Sullivan concealed from Jamison and Ellis their potential claims for profits and royalties by never informing either Ellis or Jamison of the litigation and settlement in 1999, involving Scotti Brothers' successor in interest, All American. (Counterclaim ¶¶ 62, 73-74). Jamison and Ellis further allege that they specifically asked Sullivan and the band's management about royalty payments and that Sullivan told them that no royalties would ever be paid from the Scotti Brothers' contracts because of unfavorable terms and a negative balance with the record label. (Counterclaim ¶¶ 59-60, 70,72). Ellis alleges that Sullivan made these representations to them at the same time (1996-1999) that he was pursuing litigation against All American. (Counterclaim ¶¶ 59-66). Jamison alleges that he began asking about royalties when he rejoined the band in March 2000. (Counterclaim ¶70). Those allegations, taken as true, are sufficient to withstand a motion to dismiss.

### 2. Statute of Limitations

Next, Sullivan argues that the counterclaims are barred by a five-year statute of limitations and Jamison and Ellis have known of their claim for royalties for more than five

years. *See* 735 ILCS 5/13-205 (governing oral contracts and other claims). In Illinois the statute of limitations on written contracts is ten years. 735 ILCS 5/13-206.

Illinois follows the general rule that claims arising from a contract accrue when the contract is breached, and most tort claims accrue when the plaintiff sustains an injury. Hermitage Corp. v. Contractors Adjustment Co., 166 Ill. 2d 72, 651 N.E.2d 1132, 1135 (Ill. 1995). But courts also have a discovery rule to protect those who are unaware of their right to sue, "to encourage the trial of cases on their merits and avoid premature summary dismissals." Superior Bank FSB v. Golding, 152 Ill. 2d 480, 605 N.E.2d 514, 518 (Ill. 1992). The discovery rule delays the accrual of claims until the plaintiff reasonably should know that he has been injured and that the injury was wrongfully caused. Id.

Here, Jamison and Ellis would have known that the recording contracts they entered as replacement members of Survivor would entitle them to a share of the royalties, *if such royalties were being paid*. In their counterclaim, however, Jamison and Ellis allege that they did not receive any royalty payments and Sullivan represented to them that due to the unfavorable terms of the recording contracts the band had a negative balance with the label and that no royalties would ever be paid. Even if they doubted that no royalty payments had ever been made, "an abstract fear of wrongdoing is not enough" for the statute of limitations to begin running. See CSC Holdings, Inc. v. Redisi, 309 F.3d 988, 992 (7th Cir. 2002); Sokol Crystal Prducts, Inc. v. DSC Communications Corp., 15 F.3d 1427, 1430 (7th Cir. 1994). Jamison and Ellis allege that they relied on Sullivan's representations. Therefore, it is reasonable that Jamison and Ellis would not know of a breach in the contract until they discovered that royalties were being paid. Jamison alleges that in mid-2009 he had dinner with Peterik and discovered that Peterik had been receiving 20% of the royalties. (Counterclaim ¶¶ 78-82). Jamison informed Ellis that

Peterik was receiving royalty payments.(Counterclaim ¶83). The instant counterclaim was filed in August 30, 2010, which is well within the statute of limitations, even if the claims were based on oral contracts. Since all the other claims arise out of the contracts and the claim for royalties, the remaining claims are also timely.

## **Conclusion**

For the reasons set forth in this order, Sullivan's motion to dismiss the counterclaim [47] is denied. Sullivan's motion for sanctions pursuant to Rule 11 [51] is also denied. This Court finding oral argument unnecessary in this matter, the scheduled date of 12/3/10 at 9 a.m. is stricken. The previously scheduled status date of 2/25/2011 at 9 a.m. stands.

IT IS SO ORDERED.

Date: December 1, 2010

Entered: _____
Judge Sharon Johnson Coleman